IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STEVEN JACKSON, | ) | |
| Plaintiff, | ) | |
| | ) | |
| LIBERTY MUTUAL INSURANCE CO., | ) | Civil Action No. 05-1579 |
| Intervenor Plaintiff, | ) | |
| | ) | |
| vs | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

REPORT AND RECOMMENDATION

I. Recommendation:

It is respectfully recommended that the defendant's motion to dismiss or for summary

judgment (Document No. 13), treated as a motion to dismiss, be granted.

II. Report:

Presently before the Court is a motion to dismiss the complaint for lack of subject

matter jurisdiction or, in the alternative, for summary judgment, submitted by the defendant, United

States of America ("USA").  For reasons discussed below, the defendant's current motion, treated

as a motion to dismiss, should be granted.

The plaintiff, Steven Jackson, commenced this action against the USA pursuant to

the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671, et seq., alleging that on November 21,

2002, he incurred serious bodily injuries in the course and scope of his employment with Shaw

Environmental Infrastructure, Inc. ("Shaw") due to the negligence of USA employees.  The plaintiff

was injured at the Naval Surface Warfare Center in Indian Head, Maryland (the "Naval Base"), when in his capacity as Shaw's Hazardous Materials Foreman, he began to destroy a projectile with a petrogen torch, believing it was deactivated, whereupon the projectile exploded.  The plaintiff suffered serious injuries which resulted in the amputation of his left leg, limited mobility of his left arm and shoulder, and significant burns and scars for which he seeks monetary damages.  In his FTCA complaint, the plaintiff alleges that his injuries were caused by the negligence of USA employees, who failed to properly test the projectile for an explosive charge and advised Shaw personnel the projectile had been deactivated.[1]

The FTCA vests exclusive jurisdiction in district courts for claims against the USA for money damages involving "injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. §1346(b)(1).  The FTCA provides exceptions, however, which permit the USA to retain immunity from certain types of claims.  See, 28 U.S.C. §2680.  Significantly, as used in the FTCA, the terms "Federal agency" and "Employee of the government" do not include any contractor with the United States.  See, 28 U.S.C. § 2671; Norman v. United States, 111 F.3d 356, 357 (3d Cir. 1997). "Thus, there is an independent-contractor exemption in the FTCA."  Norman, 111 F.3d at

---

1.    Liberty Mutual Insurance Co. ("Liberty Mutual") intervened in this action and filed a complaint in intervention.  It asserts it provided Shaw with a policy of workers' compensation insurance, and due to the plaintiff's work-related injuries, it became liable to him for workers' compensation benefits and is subrogated to his rights for the full amount of benefits and for all future payments made for his benefit.  As intervenor plaintiff, Liberty Mutual avers that in the event the plaintiff is awarded damages in this action, it is entitled to recover its subrogation lien against any recovery he receives.

357; accord, U.S. v. Orleans, 425 U.S. 807, 813-14 (1976).

The USA has moved to dismiss the plaintiff's complaint pursuant to F.R.Civ.P. 12(b)(1), arguing it is immune from suit by virtue of the "independent contractor" exception to the FTCA, such that the Court lacks subject matter jurisdiction over this matter.   In the alternative, the USA moves for summary judgment, asserting that the plaintiff cannot recover against it, as Shaw's negligence was the intervening and superceding cause of his injuries, and the plaintiff assumed the risk of injury when he attempted to cut the projectile with a blow torch.

A Rule 12(b)(1) motion to dismiss "may be treated as either a facial or factual challenge to the court's subject matter jurisdiction." Gould Electronics Inc. v. U.S., 220 F.3d 169, 176 (3d Cir. 2000).  In reviewing a "facial attack", which is based on the legal sufficiency of the claim, the Court "must only consider the allegations of the complaint and documents referenced therein and attached thereto in the light most favorable to the plaintiff."   Id.   Conversely, in reviewing a "factual attack", as here, where a challenge is based on the sufficiency of jurisdictional fact, "the Court is free to weigh the evidence and satisfy itself whether it has power to hear the case." See, Carpet Group Int. v. Oriental Rug Importers, 227 F.3d 62, 69 (3d Cir. 2000).  In such a scenario, "the court may consider evidence outside the pleadings", Gould Electronics, 220 F.3d at 176, as "no presumptive truthfulness attaches to plaintiff's allegations".  Carpet Group , 227 F.3d at 69.

The record shows that the USA contracted with OHM Remediation Services Corp. ("OHM") to conduct a remedial environmental clean-up at an area known as Site 41 at the Naval Base.  Shaw subsequently purchased OHM, and it is not disputed that Shaw became responsible for the Site 41 Contract, including modifications thereto.  As part of the Contract, Shaw was "to furnish all labor, materials, equipment, supervision, travel and subsistence necessary for the contractor to

perform remedial activities at Site 41".[2]

For decades, the Navy used Site 41 as a metal scrap yard, and it contained electrical transformers, scrap metal, lead batteries, rocket motors and "unexploded ordnance" ("UXO").[3]  In general, a UXO is any item that looks like an unexploded military weapon, such as ammunition, bombs, shells and projectiles.[4]  Prior to beginning the environmental remediation of Site 41, all UXO and scrap metal had to be cleared from the site.[5]  While the Navy theorized that Site 41 contained inert (non-explosive) UXO, it could not guarantee that fact, so every UXO item had to be thoroughly inspected and certified as inert before it was "demilitarized" (destroyed) and hauled away.[6]

On November 1, 2002, Shaw proposed in a written Technical Directive that it would identify, separate, screen and demilitarize the UXO items at Site 41 prior to remedial activities there at a cost of $180,000, explaining:

> This Out of Scope Technical Directive is for personnel
> and equipment to identify, separate, screen and demilling
> of UXO items remaining on the pad and for the separation,
> decontamination and on site storage of non-OE items.[7]

Shaw had represented to the Navy that it had an expertise in identifying, separating, screening and demilitarizing UXO and had performed similar work at other military installations; and on

---

2.   See, defendant's Exhibit D.

3.   See, Declaration of Jeffrey Morris at ¶ 4 (attached as defendant's Exhibit B).

4.   Id. at ¶ 5.

5.   Id. at ¶ 6.

6.   Id. at ¶¶ 7-9.

7.   See, defendant's Exhibit F.  We note that "OE" stands for "ordnance and explosives".

November 12, 2002, the Navy approved Shaw's aforesaid Technical Directive.[8]

In addition, Shaw's subsidiary, OHM, prepared a Final Revised UXO Support Plan which provided:

> The purpose of the UXO Support Plan is to provide the standard operating procedures to be used at Site 41 by Shaw E&I UXO and support personnel and to provide the methodology to prevent Shaw E&I employees and base personnel from coming into contact and accidentally disturbing potentially hazardous UXO items while performing UXO location, identification, separation, and demilitarization activities prior to, during, and after soil removal and excavation operations.[9]

In accordance with the UXO Support Plan, Shaw designated two UXO specialists and a supervisor to oversee and implement procedures for safely identifying and disposing UXO items.[10]

Site 41 contained piles of hundreds of projectiles, and UXO technicians inspected them to determine if they were inert or potentially live rounds.[11]  To demilitarize or dismantle UXO items, Shaw provided its personnel with a petrogen torch, a plasma cutter and chop saws to cut the rounds.[12]

The plaintiff testified that Steve Carrier, a Shaw employee, was the superintendent on the job site who oversaw the project on a daily basis and was responsible for instructing personnel

---

8.   See, Declaration of Jeffrey Morris at ¶ 11; Also see, defendant's Exhibit F.

9.   See, defendant's Exhibit H at p. 2-1.

10.   Id.

11.   See, plaintiff's deposition at pp. 17, 22 (attached as defendant's Exhibit C).

12.   Id. at p. 17.

there[13]; that Joe Walker, a Shaw employee, was the safety supervisor at Site 41[14]; that Al Grant, a Shaw employee, was the UXO supervisor on the job, and Shaw employees Deb Anderson and Bruce Tincknell were UXO technicians there.[15]  Importantly, the plaintiff concedes that he never received any direct orders from any Navy employees while he worked at Site 41.[16]

Still, the plaintiff points to the following facts to support his claim.  In early November 2002, before Shaw began working at Site 41, Frank James, a Navy safety officer, was asked to inspect a projectile that had been found in a trench at the Naval Base.[17]  Frank James inspected the projectile and observed it had no nose fuse, but he saw there was a hole in the center of the projectile.[18]  With a screwdriver, Mr. James scraped in the hole and saw a tracer element, which led him to believe the projectile had been fired.[19]  Mr. James then took the projectile to Site 41 and wrote a "green tag" for it, which meant it was cleared to proceed to the next level.[20]

Thereafter, the Commanding Officer at the Naval Base requested that another projectile situated at Site 41 be retrieved and cleaned, so he could display it.[21]  However, a

---

13.    Id. at pp. 22-23.

14.    Id. at pp. 24-25.

15.    Id. at pp. 24, 26.

16.    Id. at p. 24.

17.    See, deposition of Frank James at pp. 21-22 (attached as plaintiff's Exhibit 3).

18.    Id. at p. 22.

19.    Id. at pp. 22-23.

20.    Id. at pp. 25-26.

21.    Id. at pp. 29-31.

government contractor removed the same projectile which had been found in the trench and

inspected by Frank James -- not the one requested by the Commanding Officer -- and it was cleaned

and sandblasted, which made the projectile shine.[22]  When Frank James became aware that the wrong

projectile had been retrieved and sandblasted, he took the sandblasted projectile back to Site 41,

where Shaw personnel had arrived and were working.[23]  Frank James spoke to Al Grant, Shaw's

UXO supervisor, and explained why he was returning the projectile.[24]

> At his deposition, Al Grant testified as follows:
>
>> Frank [James] brought [the projectile] back to us,
>> and then I just put it off to the side.  I asked him
>> what is it, and he said don't worry about it.  It's
>> safe to cut up.  It's a shot round and safe to cut up.[25]

Al Grant reiterated that when Frank James returned the projectile "he didn't say anything.  He just

brought it up and said here is this thing, you can have it back, and I said, you know, okay, no

problem, and we put it off to the side.  We discussed what he thought it was, [which was] an obsolete

shell".[26]  Al Grant examined the sandblasted projectile, observed there was no sign of a fuse

on it and concurred it was safe to demilitarize, whereupon it was placed on the pile for processing.[27]

> On November 21, 2002, as Shaw continued its duties of identifying, screening, and

---

22.   Id. at pp. 32-34.

23.   Id. at pp. 34-35.

24.   Id. at pp. 35-36.

25.   See, deposition of Al Grant at p. 9 (attached as defendant's Exhibit N).

26.   Id. at p. 11.

27.   See, Statement of Al Grant (attached as defendant's Exhibit L).

demilitarizing UXO at the site, Al Grant re-examined the sandblasted projectile which Frank James

brought to the site and decided to try cutting it.[28]  Mr. Grant handed the projectile to the plaintiff,

who began to cut it with a petrogen torch, whereupon the projectile exploded.[29]

In Norman, supra, the Third Circuit Court of Appeals discussed the independent

contractor exception to the FTCA, stating "The critical factor used to distinguish a federal agency

employee from an independent contractor is whether the government has the power 'to control the

detailed physical performance of the contractor.'" Norman, 111 F.3d at 357, quoting Orleans, 425

U.S. at 814.  The issue "'is not whether the contractor receives federal money and must comply with

federal standards and regulations, but whether its day-to-day operations are supervised by the Federal

Government.'" Norman, 111 F.3d at 357, quoting Orleans, 425 U.S. at 815.  Where an independent

contractor is contractually-required to have its own on-site supervisor, is accorded broad

responsibility for daily maintenance, and is not supervised or directed by the United States, the

independent contractor exception to the FTCA will shield the United States from liability.  Norman,

111 F.3d at 357-58.

Here, the record shows that Shaw was contractually obligated "to furnish all labor,

materials, equipment, supervision, travel and subsistence necessary for the contractor to perform

remedial activities at Site 41".[30]  Pursuant to OHM's Final Revised UXO Support Plan, Shaw had

---

28.   Id.

29.   See, plaintiff's deposition at pp. 26, 29.

30.   See, defendant's Exhibit D.

its own on-site UXO team, which included UXO technicians and a UXO supervisor.[31]  Shaw also

had its own employee, Steve Carrier, on the site as superintendent, to oversee the project on a daily

basis, with responsibilities for instructing personnel there.[32]  Clearly, the USA did not direct, nor

supervise Shaw's activities at Site 41.

Nonetheless, the plaintiff argues that the independent contractor exception to the

FTCA does not apply, as Frank James' aforesaid acts amount to the USA exercising control over

Shaw's contractual duties with respect to the projectile which injured him.  We disagree.

Prior to Shaw commencing operations at Site 41, Frank James inspected the projectile

at issue, after which he placed it at Site 41.  Since the Navy used Site 41 as a metal scrap yard for

decades, it contained several forms of UXO[33], most of which were placed there before Shaw began

its work there.  The projectile was subsequently removed from the site, where it was cleaned and

sandblasted, but those acts all occurred before Shaw arrived at the site. In mid-November 2002,

Frank James returned the projectile to Site 41, at which time Shaw was working there.

As discussed above, Frank James explained to Al Grant why he was returning the

projectile to the site.  Although the plaintiff believes that Frank James exercised control over the

projectile, or sought to take over Shaw's contractual responsibilities for it, the record shows

otherwise.  Al Grant testified that when Frank James returned the projectile, "he didn't say anything.

---

31.   See, defendant's Exhibit H at p. 3-1.

32.   See, plaintiff's deposition at pp. 22-23.

33.   See, Declaration of Jeffrey Morris at ¶ 4.

He just brought it up and said ... you can have it back... and we put it off to the side."[34]   Indeed, it was only after Al Grant asked Frank James what he thought it was, that James proffered his opinion that it was an obsolete shell and safe to cut up.[35]   Al Grant examined the projectile, concurred that it was safe to demilitarize, and the projectile was placed on the pile for processing.[36]   On November 21, 2002, Al Grant, in accordance with Shaw's contractual obligations, re-examined the projectile, decided to try cutting it, and handed it to the plaintiff for cutting, after which it exploded.[37]

The record shows that Frank James did not direct, nor supervise Shaw's actions with respect to the projectile at issue.  Rather, it was Shaw who supervised the day-to-day operations at the site, not the Navy.[38]   Accordingly, the USA is immune from suit by virtue of the independent contractor exception to the FTCA.

In opposing the USA's current motion, the plaintiff introduces the "Good Samaritan" doctrine as a theory of liability for the first time.  Nowhere in the complaint did the plaintiff raise this claim, nor did he seek to amend his complaint to add such a claim during discovery.  With discovery now closed, however, and in response to the defendant's current  motion, the plaintiff argues for the first time that the USA voluntarily assumed a duty to the plaintiff and is liable to him under Maryland's "Good Samaritan" doctrine.[39]

---

34.   See, deposition of Al Grant at p. 11.

35.   Id. at pp. 9, 11.

36.   See, Statement of Al Grant.

37.   Id.  Also see, plaintiff's deposition at pp. 26, 29.

38.   Id. at p. 24.

39.   See, plaintiff's opposition brief at pp. 10-11, 15-16.

Courts are reluctant to allow a plaintiff to raise a new theory of liability in response to a motion for summary judgment that was not set forth in the complaint, nor added in discovery. See, Laurie v. National Passenger Railroad Corp., 105 Fed.Appx. 387, 392-93 (3d Cir. 2004), citing Speziale v. Bethlehem Area School Dist., 266 F.Supp.2d 366, 371, n.3 (E.D.Pa. 2003) ("Plaintiff's counsel cannot reasonably expect to amend the complaint after the close of discovery merely by raising new arguments in the responsive papers" to a motion for summary judgment); OTA Ltd. P'Ship v. Forcenergy, Inc., 237 F.Supp.2d 558, 561, n. 3 (E.D.Pa. 2002) (holding that a new claim that was first raised in opposition to a motion for summary judgment was "too late"); Bulkoski v. Bacharach, Inc., 1 F.Supp.2d 484, 487 (W.D.Pa. 1997) (holding that after a summary judgment argument, "[i]t is too late for plaintiff to change his theory of the case"), aff'd., 149 F.3d 1163 (3d Cir. 1998) (table decision).   Thus, the Court need not address the plaintiff's newly-raised "Good Samaritan" theory of liability.

Assuming, arguendo, that the Court is required to address the plaintiff's newly-raised Good Samaritan claim, it is clear that the claim lacks merit. As noted above, the FTCA requires that the government's liability be determined "in accordance with the law of the place where the act or omission occurred",  28 U.S.C. § 1346(b)(1), which in this case is Maryland.

The Good Samaritan doctrine is applicable in FTCA cases, and it is part of the tort law of Maryland. In re Sabin Oral Polio Vaccine Products Liab. Litig., 774 F.Supp. 952, 954-55 (D.Md. 1991), aff'd., 984 F.2d 124 (4th Cir. 1993).  The Good Samaritan doctrine is recognized in §§ 323 and 324A of the Restatement (Second) of Torts, and both sections address situations in

which an individual "undertakes, gratuitously or for consideration, to render services to another."[40]

The principle failing of the plaintiff's Good Samaritan theory is that Frank James did not undertake to render services to the plaintiff or to any other Shaw employee. As detailed above, Frank James merely brought the projectile to Site 41. Al Grant acknowledged that Frank James "didn't say anything" when he delivered the projectile to the site; Grant testified that "[h]e just brought it up and said... you can have it back... and we put it off to the side."[41] Only when Al Grant asked Frank James for his opinion on the projectile did Mr. James respond.[42] Certainly, Frank James did not undertake to render services to the plaintiff, nor to anyone else at the site. Accordingly, the plaintiff's newly-raised Good Samaritan claim lacks merit.[43]

---

40. Sections 323 and 324A of the Restatement (Second) of Torts provide:
§ 323 – Negligent Performance of Undertaking to Render Services:
"One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if (a) his failure to exercise such care increases the risk of such harm, or (b) the harm is suffered because of the other's reliance upon the undertaking.
§ 324A – Liability to Third Person for Negligent Performance of Undertaking:
"One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if (a) his failure to exercise reasonable care increases the risk of such harm, or (b) he has undertaken to perform a duty owed by the other to the third person, or (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

41. See, deposition of Al Grant at p. 11.

42. Id. at pp. 9, 11.

43. Having found that the USA is immune from suit by virtue of the independent contractor exception to the FTCA, we did not address the USA's alternate arguments that Shaw's negligence was the intervening and superceding cause of the plaintiff's injuries, and that the plaintiff assumed the risk of injury. Significantly, we note that the plaintiff has not opposed the USA's alternate arguments in support of their current motion.

Therefore, it is recommended that the defendant's motion to dismiss or for summary (Document No 13), treated as motion to dismiss, be granted.

Within thirteen (13) days after being served with a copy, any party may serve and file written objections to this Report and Recommendation.  Any party opposing the objections shall have seven (7) days from the date of service of objections to respond thereto.  Failure to file timely objections may constitute a waiver of any appellate rights.

Respectfully submitted,


s/ ROBERT C. MITCHELL
United States Magistrate Judge

Dated: October 19, 2006